[No. A064628. First Dist., Div. Two. Apr. 25, 1995.]

DIANNE HOLLINGSHEAD, Individually and as Administrator, etc., Plaintiff and Appellant, v.
RALPH MATSEN et al., Defendants and Respondents.

[No. A064631. First Dist., Div. Two. Apr. 25, 1995.]

NYLE G. HENDERSON et al., Plaintiffs and Appellants, v.
RALPH MATSEN et al., Defendants and Respondents.

■■■■■■■■■■■■■■■■■■■

COUNSEL

Roberts, Hill, Calligan, Bragg & Feeney and William R. Bragg for Plaintiffs and Appellants.

Moss & Enochian, Larry B. Moss and Mark D. Norcross for Defendants and Respondents.

OPINION

KLINE, P. J.—

### Introduction

In these consolidated cases[1] plaintiffs Nyle G. Henderson and Diane Henderson and plaintiff Dianne Hollingshead, individually and as administrator of the estate of Raymond Styol Hollingshead, appeal following adverse summary judgments of the Humboldt County Superior Court finding plaintiffs' claims preempted by the Employee Retirement Income Security Act of 1974 (ERISA) and dismissing their claims against defendants Ralph Matsen, R.G. Matsen Insurance Agency, Inc., and Robert Burchitt, insurance brokers and agents.[2] We shall affirm the judgment.

### Statement of Facts/Procedural Background

Raymond Hollingshead, the deceased husband of plaintiff Hollingshead, was an employee of Customer Truck Service, Inc. In late 1989, plaintiff Nyle Henderson, president of Customer Truck Service Inc. (CTS),[3] was approached by defendant Robert Burchitt, a licensed insurance agent working for and on behalf of defendant R.G. Matsen Insurance Agency, Inc., and its owner defendant Ralph Matsen. Burchitt offered to review the group health insurance plan that was made available by CTS to its employees. CTS

---

[1] We consolidated these cases on our own motion by order dated February 8, 1995, as the defendants, the material facts, and issues involved are virtually identical. By order dated January 23, 1995, we requested additional briefing from plaintiff Hollingshead regarding defendants' claim that she could not maintain certain causes of action on her own behalf. Our resolution of the other issues in this case make it unnecessary to address that issue.

[2] The pleadings and briefs do not differentiate between the terms "broker" and "agent" and use those terms without reference to the Insurance Code provisions that define "agent" as a person acting for an insurer (Ins. Code, § 31) and define "broker" as a person who acts or transacts insurance (other than life insurance) "with, but not on behalf of, an insurer." (Ins. Code, § 33.) Case authority has also used the term "agent" as referring to one who acts on behalf of an insured. (See, e.g., *Jones* v. *Grewe* (1987) 189 Cal.App.3d 950, 954 [234 Cal.Rptr. 717].) We use the terms in their generic, rather than their technical, meaning. (See *Kurtz, Richards, Wilson & Co.* v. *Insurance Communicators Marketing Corp.* (1993) 12 Cal.App.4th 1249, 1254, fn. 1 [16 Cal.Rptr.2d 259].)

[3] Also known as Customer Truck and Coach.

made available to its employees a group health insurance policy and paid the premiums for the employees who wished to participate. Dependent premiums were paid by the employee.

Defendants had handled the insurance needs of Henderson, CTS and its employees for several years. Neither Henderson nor CTS employees were knowledgeable in the field of health insurance and they relied upon defendants. Henderson considered Burchitt to be his personal insurance agent and the personal agent of CTS employees. Burchitt held himself out as available for providing specialized individual service to each CTS employee. Burchitt gave directions to have each employee contact him directly if they had any questions or needed help with regard to their insurance coverage. Many employees did so. Burchitt represented himself as having special expertise in group health insurance plans and indicated he felt he not only could find a plan with significantly lower premiums than CTS was then paying, but which also provided better individualized service to the employees and their families.

In December 1989, Burchitt advised Henderson that he had found a plan which was a solid, financially strong and reliable plan to offer to employees of CTS. Henderson accepted Burchitt's representations of special expertise in the area of employee group health insurance plans and relying upon his assurances of the strength and reliability of the recommended plan, Henderson canceled the existing group health policy being offered to CTS employees through Guardian Life Insurance Company and offered them coverage through American Pacific Employers Trust (APET).[4]

Burchitt enrolled CTS and its employees in APET. APET is a "multiple employer membership arrangement" offering to "nonprofit corporations and/or businesses organized for profit" individual and group insurance policies issued by insurance carriers. Employees filled out individual applications provided by Burchitt. Coverage was effective January 1, 1990. APET was administered by Capitol Benefit Group, Inc., (CBG) and Anpac Administrators, Inc. (Anpac). CBG acted as the marketing/underwriting agent for the APET plan, and Anpac acted in a claims adjusting function.

CBG and Anpac, as administrators for the APET plan, acquired insurance for plaintiffs through Promed International, Ltd. (Promed), alleged by plaintiffs to be a British Virgin Islands corporation with its principal worldwide place of business outside the United States. Promed was a nonadmitted alien

---

[4]One of CTS's employees was offered coverage through a different plan found by Burchitt because that employee's family had significant preexisting health problems relating to their daughter's congenital heart defect.

insurer and alleged to be a financially unsound, unsafe and irresponsible insurance carrier.

The insurance fund or program was established on February 26, 1990, pursuant to a trust agreement (the American-Pacific Employers' Trust) and a group life, accident, and health master policy was issued by Promed with coverage retroactive to January 1, 1990, for subscribing employers, their employees, and their employees' dependents. Promed's insurance coverage of the APET plan terminated on April 30, 1991, and another company took over coverage of the APET plan on May 1, 1991. At that time, there were a significant number of outstanding claims which had been approved by CBG and Anpac and submitted to Promed for funding. Promed failed to fund these approved claims.

In the booklet provided to Henderson and his employees, Promed was not mentioned as being the insurance company. The company mentioned was California Benefit Life of Newport Beach, California and Cal-Builders Insurance Trust. Defendant insurance brokers failed to advise plaintiffs of the existence, status, nature and makeup of Promed, nor did they advise plaintiffs that the insurance policy issued by Promed became worthless and provided no or negligible coverage from approximately January 1, 1991, through May 1, 1991.

From January 1, 1991, Henderson and Hollingshead each suffered health care problems and incurred significant costs to health care providers for services provided. Thereafter, Henderson and Hollingshead were advised that Promed would not pay those claims and that they had no recourse with the California Department of Insurance because of Promed's status.

CBG and Anpac sued Promed in federal district court in Sacramento and in December 1992 obtained a default judgment against Promed and its principals on behalf of the APET plan for an amount in excess of $5 million. This judgment included all APET claims Promed failed to pay, including the claims of Henderson and Hollingshead. That judgment remains unsatisfied.

On November 24, 1992, plaintiff Hollingshead filed a second amended complaint against defendants Burchitt, Ralph Matsen, and R.G. Matsen Insurance Agency, Inc.. On December 31, 1992, the Henderson plaintiffs filed their first amended complaint against defendants. Both complaints alleged causes of action for negligence, fraud and breach of fiduciary duties, breach of oral contract, intentional infliction of emotional distress, negligent infliction of emotional distress, fraud and deceit and intentional misrepresentation of fact.

Plaintiffs alleged they had been damaged in that they incurred obligations for medical costs and related services for the period of time from approximately January of 1991 through and including May of 1991; that they sustained existing and outstanding and unpaid medical bills beginning in January 1991 and continuing thereafter, which tarnished and diminished their reputations as financially responsible people; all of which caused plaintiffs emotional distress.

Defendants moved for summary judgment below on the grounds that all of the claims against it were preempted by virtue of ERISA (29 U.S.C. § 1001 et seq.) The trial court granted summary judgments for defendants finding there was no contested issue of material fact that "the insurance policies in question comprise 'employee welfare benefit plans' within the meaning of ERISA" and that "the claims against defendants here are 'related to,' or are connected with the essence of the health plan itself . . . ." Consequently, the court found that ERISA preempted the causes of action against the insurance agents. Judgments were entered in favor of defendants in each action. These timely appeals followed.

*Discussion*

I.

The sole basis for defendants' motion for summary judgment was that plaintiffs' actions against defendant brokers were preempted by ERISA. "A defendant who moves for summary judgment must either *prove* an affirmative defense which would bar every cause of action pled in the complaint or *disprove* at least one essential element of each cause of action in the complaint. [Citation.] The moving party must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires examination by trial. [Citations.] If the defendant does not satisfy its burden as the moving party, the motion must be denied, and it is unnecessary for the court to consider the plaintiff's opposition, if any. [Citations.]" (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674].)[5]

"ERISA is a comprehensive federal law designed to promote the interests of employees and their beneficiaries in employee pension and

---

[5]"In evaluating the correctness of a ruling under section 437c, we must independently review the record before the trial court. Because the grant or denial of a motion under section 437c involves pure questions of law, we are required to reassess the legal significance and effect of the papers presented by the parties in connection with the motion. (*Saldana* v. *Globe-Weiss Systems Co.* (1991) 233 Cal.App.3d 1505, 1513. . . .)" (*Chevron U.S.A., Inc.* v. *Superior Court, supra,* 4 Cal.App.4th at p. 548.)

benefit plans. (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 90. . . .) As a part of this integrated regulatory system, Congress enacted various safeguards to preclude abuse and to secure the rights and expectations that ERISA brought into being. (29 U.S.C. § 1001; see also Sen. Rep. No. 93-127, 1st Sess., p. 36 (1973).) Prominent among these safeguards is an expansive preemption provision, found at section 514 of ERISA (29 U.S.C. § 1144; *Ingersoll-Rand* v. *McClendon* (1990) 498 U.S. 133, 137-138 [112 L.3d.2d 474, 482-483, 111 S.Ct. 478]; *Carpenters So. Cal. Admin. Corp.* v. *El Capitan Development Co.* (1991) 53 Cal.3d 1041, 1047. . . .)" (*Marshall* v. *Bankers Life & Casualty Co.* (1992) 2 Cal.4th 1045, 1051 [10 Cal.Rptr.2d 72, 832 P.2d 573] (hereafter *Marshall*).)

"ERISA's preemption clause is conspicuous for its breadth, establishing as an area of exclusive federal concern the subject of every State law that 'relates to' an employee benefit plan governed by ERISA. [Citation.] ERISA preempts 'any and all State laws insofar as they . . . relate to any employee benefit plan,' except laws 'which regulate insurance . . . .' (29 U.S.C. § 1144(a), (b)(2)(A).)" (*Marshall, supra,* 2 Cal.4th at p. 1051.)

"ERISA's preemption provision is 'deliberately expansive' and is designed to make pension plan regulation an exclusively federal concern. (*Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 46. . . .) It is not, however, all encompassing. 'Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan.' (*Shaw* v. *Delta Air Lines, Inc., supra,* 463 U.S. at p. 100, fn. 21 . . . .)" (*Kurtz, Richards, Wilson & Co.* v. *Insurance Communicators Marketing Corp., supra,* 12 Cal.App.4th 1249, 1259-1260.) We use the term "relate to" in its " 'broad common-sense meaning.' " (*Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 47 [95 L.Ed.2d 39, 47-48, 107 S.Ct. 1549].)

The consequences of ERISA preemption are significant for plaintiffs. ERISA limits plan participants and beneficiaries, such as plaintiffs, to causes of action for recovery of policy benefits only. (29 U.S.C. § 1132(a)(1)(B).) Moreover, it appears further that plaintiffs have no remedy against these agent defendants under ERISA.[6] (*Ibid.; Kurtz, Richards, Wilson & Co.* v. *Insurance Communicators Marketing Corp., supra,* 12 Cal.App.4th at p. 1262.) The lack of an ERISA remedy is not determinative of preemption,

---

[6]This is not to say plaintiffs were completely without remedy. We take judicial notice of plaintiffs' ERISA action against plan fiduciaries (Henderson v. Capital Benefit Group, Inc. (U.S. Dist. Ct. (N.D.Cal.) No. C-94-1486 EFL)) filed in the United States District Court for the Northern District of California. (Evid. Code, § 452, subd. (d).) The parties have advised us that a settlement in that action was reached and the action was dismissed by stipulated order on December 23, 1994.

however. "In enacting ERISA's preemption provision, Congress was aware that the broad preemption might create regulatory vacuums. [Citation.] However, those gaps in the remedy exist ' "when Congress determines that federal law should govern a broad area to the exclusion of state regulation and chooses not to prohibit the actions formerly prohibited by state law." ' [Citations.]" (*Kurtz, supra,* 12 Cal.App.4th at pp. 1262-1263.)

■ The initial question we face is whether the employer established an "employee welfare benefit plan" within the meaning of ERISA. An "employee welfare benefit plan" is defined in ERISA as " 'any plan, fund, or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .' " (29 U.S.C. § 1002(1); see *Marshall, supra,* 2 Cal.4th at p. 1052.)

"By definition, then, a welfare plan requires (1) a 'plan, fund, or program' (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, [and other specified] benefits (5) to participants or their beneficiaries." (*Donovan* v. *Dillingham* (11th Cir. 1982) 688 F.2d 1367, 1371.)

■ "The existence of an ERISA plan is a question of fact, to be answered in light of all of the surrounding circumstances as viewed by a reasonable person. (*Kanne* v. *Connecticut General Life Ins. Co.* (9th Cir. 1988) 867 F.2d 489, 492.) The burden is on defendants to prove facts necessary to establish the defense of ERISA preemption. (*Id.* at pp. 492, fn. 4.)" (*Marshall, supra,* 2 Cal.4th at p. 1052.) ■ The first step in answering that question is to determine whether an employee benefit plan was created.

Our review is informed by the ruling of our California Supreme Court in *Marshall, supra,* 2 Cal.4th 1045. There, the court held that an employer that purchases a group health insurance policy to cover its employees and their dependents establishes an employee benefit plan within the meaning of ERISA even though the employer's involvement in administration of benefits under the policy is minimal. (*Id.,* at p. 1049.) Consequently, *Marshall* held an employee's state law action seeking damages from the insurance company and its administrators for denial of a claim for policy benefits preempted by federal law. (*Ibid.*)

*Marshall* rejected the contention that there can be no employee benefit plan unless the employer is involved in the plan's administration. (2 Cal.4th at p. 1052.) Reasoning that the statute expressly contemplates the purchase of insurance as a possible means of providing employees and their dependents with medical benefits, the court also concluded the plan could be administered by someone other than the sponsoring employer. (*Id.,* at pp. 1052-1053, citing 29 U.S.C. §§ 1002(16)(A), 1002(b)(2), 1105(c) and 29 C.F.R. § 2560.503-1(c), (g)(2) (1984).) Not only did *Marshall* conclude the employer need not be involved in plan administration, but it also acknowledged that "the plan need not be in writing in order to exist. . . ." (2 Cal.4th at p. 1054, citation omitted.) Following the test formulated in *Donovan* v. *Dillingham, supra,* 688 F.2d 1367, the *Marshall* court had no difficulty determining that a plan was established. "To hold that a plan exists, the court must be able to determine 'whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.' (*Donovan* v. *Dillingham, supra,* 688 F.2d 1367, 1373 [en banc]; [citations].)" (2 Cal.4th at p. 1054.) As was the case in *Marshall,* "These criteria are easily met in this case." (*Ibid.*) There is no dispute that "the intended benefits were the payment of medical and hospitalization expenses under the group insurance policy [purchased by CTS through APET]; the beneficiaries were [CTS's] employees and covered dependents; the source of financing was the premiums paid by [CTS] and the employees; and the procedure for receiving benefits was the submission to [Promed via CBG and Anpac] of claim forms . . . ." (*Ibid.*)

■ Having determined that a "plan" was created, we must next determine whether it is an ERISA plan. (*Marshall, supra,* 2 Cal.4th at p. 1054; *Hansen* v. *Continental Ins. Co.* (5th Cir. 1991) 940 F.2d 971, 977.) "An ERISA plan is one established or maintained by the employer with the purpose of providing its employees with any of the types of benefits specified in ERISA. (See 29 U.S.C. § 1002(1) ['medical, surgical, or hospital care or benefits'].)" (*Marshall, supra,* 2 Cal.4th at p. 1055.) There is no dispute the benefits sought by plaintiffs fall within the categories enumerated by ERISA.

The question remains whether CTS " 'established or maintained' " the plan in order to provide its employees with medical, surgical or hospitalization benefits. (*Marshall, supra,* 2 Cal.4th at p. 1055.) "No single act in itself necessarily constitutes the establishment of a plan (*Donovan* v. *Dillingham, supra,* 688 F.2d at p. 1373), but an employer can establish an ERISA plan 'rather easily.' (*Credit Managers Ass'n* v. *Kennesaw Life & Acc. Ins.* (9th Cir. 1987) 809 F.2d 617, 625.) The Court of Appeals for the Ninth Circuit has

noted in dicta that '[e]ven if an employer does no more than arrange for a "group-type insurance program," it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees.' (*Ibid.*, citing 29 C.F.R. § 2510.3-1(j) (1975).)" (*Marshall, supra,* 2 Cal.4th at p. 1055.)

"The United States Department of Labor has promulgated a regulation excluding group insurance programs from ERISA's definition of 'employee benefit plan' when: (1) the employer makes no contributions toward premiums; (2) participation is completely voluntary for employees; (3) the employer's sole functions are, without endorsing the program, to allow the insurer to publicize it to employees, to collect premiums through payroll deductions, and to remit them to the insurer; and (4) the employer receives no consideration in connection with the program other than reasonable compensation for administrative services rendered in connection with the payroll deductions. (29 C.F.R. § 2510.3-1(j).) All four conditions must be present in order for the plan to fall outside ERISA [citation] . . . ." (*Marshall, supra,* 2 Cal.4th at p. 1055; *Kanne* v. *Connecticut General Life Ins. Co., supra,* 867 F.2d at p. 492.)

It is conceded that CTS contributed toward premiums, paying approximately 90 percent of the employee's health care premium and a portion of the premium for the employee's dependents. Employees were not consulted concerning the insurance decision and while they could theoretically choose not to participate, a nonparticipating employee's salary or compensation would not increase as a result of premium savings. All employees did participate. The employer here chose the APET plan, and retained the right to cancel the plan. Nor did the employer receive consideration in connection with the program. Clearly, the conditions for exclusion from ERISA's definition of "employee benefit plan" have not been met here.

Certainly, in subscribing to the APET plan to provide benefits for its employees, CTS did more than make a "bare purchase" of insurance. (*Marshall, supra,* 2 Cal.4th at p. 1055.) Under the compulsion of *Marshall,* we must conclude that CTS established an ERISA employee benefit plan when it subscribed to APET and obtained the insurance policy thereunder.

This conclusion is further strengthened by the acknowledgment in *Marshall* that an ERISA plan may be established despite the fact the employer "neither complied with ERISA's requirements nor intended to

create an ERISA plan. . . ." (*Marshall, supra,* 2 Cal.4th at p. 1058, citations omitted.)[7]

The parties vigorously dispute whether APET itself is an ERISA plan. It is conceded that APET is a "multiple employer welfare arrangement" (MEWA). A MEWA may or may not constitute an ERISA plan. In *Donovan* v. *Dillingham, supra,* 688 F.2d at page 1372, the court noted in dicta that, "An issue in other cases has been whether a multiple employer trust—the enterprise—is itself an employee welfare benefit plan. The courts, congressional committees, and the Secretary uniformly have held they are not." Subsequent cases such as *Kanne* v. *Connecticut General Life Ins. Co., supra,* 867 F.2d 489, clarify that a multiple employer trust (MET) may constitute an ERISA employer and may function so as to create an ERISA plan if statutory requirements are met. (*Id.,* at p. 493 [group health plan administrator functioned as "employer" as defined in ERISA, preventing exclusion from ERISA coverage even though employer-subscriber may have satisfied all four exclusionary criteria].) Further, a MEWA may constitute an "employee welfare benefit plan" governed by ERISA. (*Ibid.*) *Donovan* acknowledges that an individual employer may establish or maintain a "single employer" ERISA plan regardless of whether the MEWA in which the employer participates is itself an ERISA plan. (*Donovan* v. *Dillingham, supra,* 688 F.2d at pp. 1372, 1374-1375 [employer that subscribes to multiple-employer insurance trust to provide health insurance to its employees can be said to have established or maintained employee welfare benefit plan under ERISA, although the MET itself is not an employee welfare benefit plan and is subject to state laws regulating insurance]; see also *MDPhysicians & Associates* v. *State Bd. of Ins.* (5th Cir. 1992) 957 F.2d 178, 182, fn. 4.)

Consequently, were we to agree with plaintiffs that the APET itself was not an ERISA plan because the employer-subscribers were not sufficiently related, that determination would not determine the central question whether CTS established or maintained a single employer ERISA plan. We are compelled to conclude, as did the trial court, that the undisputed material facts demonstrate that CTS established an ERISA plan.

Plaintiffs rely upon three cases as supporting their contention that APET is not an ERISA plan. These cases are distinguishable as they focus upon the MEWA and not the single employer.

---

[7]"Our conclusion that [the employer] established and maintained a plan under ERISA is not altered by the fact that [the employer] neither complied with ERISA's requirements nor intended to create an ERISA plan. [Citations.] The test of whether a benefit plan is exempt from ERISA is not one of the employer's motivation. [Citation.] An employer cannot 'opt out' of ERISA by noncompliance." (2 Cal.4th at p. 1058.)

*Taggart Corp.* v. *Life & Health Benefits Admin.* (5th Cir. 1980) 617 F.2d 1208, certiorari denied *sub nom. Taggart Corp.* v. *Efros* (1981) 450 U.S. 1030 [68 L.Ed.2d 225, 101 S.Ct. 1739], as described in *Donovan,* "held that the MET, which was providing group insurance to employers too small to qualify for group rates on their own, was not itself an employee welfare benefit plan and that Taggart Corporation's subscription to the MET to furnish insurance coverage to Taggart Corporation's *sole employee* did not constitute a 'plan, fund, or program' within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1)." (*Donovan* v. *Dillingham, supra,* 688 F.2d at p. 1375, italics added.) *Donovan* agreed with *Taggart* that the MET itself was not an employee welfare benefit plan and that there was no employee welfare benefit plan. "Plaintiffs Kansas and Taggart Corporation alleged that the MET was the welfare plan. Neither party argued that Taggart Corporation had a plan, fund, or program. *Taggart* 617 F.2d at 1211. Moreover, the *Taggart* district court appeared to agree with the parties that Taggart Corporation did not have a welfare plan when it found that the MET insured some employees directly and the 'circumstances surrounding the submission of the subscription agreement by Stanley M. Kansas . . . simply involve[d] the purchase of insurance by plaintiff, Stanley M. Kansas, for himself and his family.' [Citation.]" (*Ibid.*)

Although agreeing with the holding of *Taggart* that the MET did not constitute an employee welfare benefit plan, *Donovan* found *Taggart*'s reasoning that Taggart Corporation did not have a "plan, fund or program" encouraged too broad an interpretation. *Donovan* rejected the implication "that an employer or employee organization that only purchases a group health insurance policy or subscribes to a MET to provide health insurance to its employees or members cannot be said to have established or maintained an employee welfare benefit plan, . . ." (*Donovan* v. *Dillingham, supra,* 688 F.2d at p. 1375.)

*MDPhysicians & Associates* v. *State Bd. of Ins., supra,* 957 F.2d 178, also presented the question whether MDP, a physician-created MEWA, was itself either an employer or a employee welfare benefit plan within the ambit of ERISA. In that case the state of Texas sought to regulate MDP. The federal court dismissed MDP's suit for declaratory relief, concluding it lacked subject matter jurisdiction and the Fifth Circuit affirmed, concluding the MDP was not an ERISA plan. In so concluding, the court focused on the fact that the subscribing employers neither established the plan nor participated in day-to-day operation or administration of the plan (*id.,* at p. 185); that MDP did not act indirectly for the subscribing employers, but acted for itself in relation to the plan, advertising the plan as a commercial product to employers at large (*ibid.*); that the relationship between MDP as the provider

of benefits and the recipients of the benefits under the plan lacked the "protective nexus" (*id.,* at p. 186) requiring " 'that the entity that maintains the plan and the individuals that benefit from the plan [be] tied by a common economic or representation interest, *unrelated to the provision of benefits.'* [Citation.]" (*Id.,* at p. 185.) The court observed this last factor most commonly is found in the "relationship between employees and a person acting directly as their employer. [Citation.] The representational link between employees and an association of employers in the same industry who establish a trust for the benefit of those employees also supplies the requisite connection. [Citation.] This special relationship protects the employee, who can rely on the 'person acting directly as an employer' or the person 'acting indirectly in the interests of' that employer to represent the employee's interests relating to the provision of benefits. [Citation.]" (*Id.,* at pp. 185-186.)

Were the focus of our case solely the APET, and whether it was subject to ERISA, the lack of relationship among the subscribing employers and between the APET and the individuals benefiting from the plan could preclude affirmance of the summary judgment.

However, *MDPhysicians* itself noted it was not determining whether any *individual employer* directly established or maintained a plan subject to ERISA. "We emphasize that we merely decide the narrow issue presented on appeal: Whether the multiple employer welfare arrangement, the MDP Plan, constitutes an EWBP governed by ERISA. *We do not decide whether any of the Subscribing Employers directly established or maintained 'single employer' EWBPs covered by ERISA—that is, 'whether each employer who subscribed to the [MDP Plan] thereby established its own individual ERISA plan.'* [Citations.] The Board attempted to regulate the MDP Plan, not single employer plans. MDP alleged 'fiduciary' status only with respect to the MDP Plan, not with respect to distinct plans possibly established by individual Subscribing Employers. [Citations.]" (*MDPhysicians & Associates* v. *State Bd. of Ins., supra,* 957 F.2d at p. 182, fn. 4, italics added.)[8]

*Bell* v. *Employee Sec. Ben. Ass'n.* (D.C.Kan. 1977) 437 F.Supp. 382, also concerns a state's attempt to regulate a self-described employee benefit plan and has little relevance to the issue here. In *Bell,* the court determined that a program of insurance provided by a third party entrepreneur, rather than by

[8]A multiple employer trust " 'even though it is not an employee benefit welfare plan, may nonetheless be subject to ERISA's fiduciary responsibilities if it is a fiduciary to employee benefit plans established or maintained by other entities.' " (*MDPhysicians & Associates* v. *State Bd. of Ins., supra,* 957 F.2d at p. 182, fn. 4, quoting from *Donovan* v. *Dillingham, supra,* 688 F.2d at p. 1372, fn. 10.)

an employer or preexisting employee group such as a union, was not an "employee welfare benefit plan" within ERISA, where the operation of the program provided profitmaking opportunities for the marketing agency and administrative services provider; where there was no commonality of interest among employee members; and where membership in the program was not limited to one employer, industry or union, but was open to virtually any self-employed person. (*Id.,* at pp. 395-396.) The plan was held subject to state insurance laws and regulations. (*Ibid.*)

These three cases neither address the question nor provide guidance as to whether the individual employer (here CTS) has established an "employee welfare benefit plan" subject to ERISA. Upon the undisputed material facts before the trial court, CTS established such an ERISA plan.

## II.

Determination that CTS established an "employee welfare benefit plan" subject to ERISA does not necessarily mean these actions against defendant brokers are preempted.

In *Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. 41, the United States Supreme Court held that ERISA preempts all common law causes of action for breach of contract and tort as against an insurance company which issues a group insurance policy for the benefit of an employer or its employees. That holding was reaffirmed in *Metropolitan Life Ins. Co.* v. *Taylor* (1987) 481 U.S. 58 [95 L.Ed.2d 55, 107 S.Ct. 1542]. (See, e.g., *Dearth* v. *Great Republic Life Ins. Co.* (1992) 9 Cal.App.4th 1256 [12 Cal.Rptr.2d 78]; *Kanne* v. *Connecticut General Life Ins. Co., supra,* 867 F.2d 489.)

Relying upon *Kurtz, Richards, Wilson & Co.* v. *Insurance Communicators Marketing Corp., supra,* 12 Cal.App.4th 1249 (*Kurtz*), plaintiffs strenuously argue that claims against insurance agents acting for the insured, rather than the insurer are not "related to" the ERISA plan and are "too tenuous, peripheral, and remote to support ERISA preemption." (*Id.,* at p. 1262.) *Kurtz* recognized that "[o]nly a few cases have examined the question of ERISA preemption of claims against insurance agents. Those cases reach inconsistent results, and none is squarely on the facts with our case, since none considers claims against an agent acting for an insured, the situation presented here." (*Id.,* at p. 1260.)

*Kurtz* reviewed *Dearth* v. *Great Republic Life Ins. Co., supra,* 9 Cal.App.4th 1256, *Farlow* v. *Union Cent. Life Ins. Co.* (11th Cir. 1989) 874 F.2d 791, *Belasco* v. *W.K.P. Wilson & Sons, Inc.* (11th Cir. 1987) 833 F.2d

277, and *Provience* v. *Valley Clerks Trust Fund* (1984) 163 Cal.App.3d 249 [209 Cal.Rptr. 276], all finding claims against insurance agents for their actions relating to ERISA plans preempted, and distinguished these cases on the basis that the agents were not alleged to have been acting for the insured. *Kurtz* instead chose to follow *Perkins* v. *Time Ins. Co.* (5th Cir. 1990) 898 F.2d 470, which found no ERISA preemption of a state law action by an employer against an independent insurance agent who allegedly solicited the plaintiffs' participation in an ERISA plan and allegedly misrepresented plan coverage in order to induce plaintiffs to give up existing coverage and join the plan in violation of a state statute. The Fifth Circuit held that while claims against the insurer were preempted, "we are not persuaded that this logic should extend to immunize agents from personal liability for their solicitation of potential participants in an ERISA plan prior to its formation." (*Perkins, supra,* 898 F.2d at p. 473; *Kurtz, supra,* 12 Cal.App.4th at p. 1260.) "The [*Perkins*] court found that the claim 'relates to' the plan only indirectly: '[a] state law claim . . . which does not affect the relations among the principal ERISA entities (the employer, the plan fiduciaries, the plan, and the beneficiaries) as such, is not preempted by ERISA.' (*Ibid.*)" (*Kurtz, supra,* 12 Cal.App.4th at p. 1260.)

As persuasive as we find the *Kurtz* court's reasoning distinguishing claims against the insured's agent from claims against the agent acting for the ERISA insurer, it does not assist plaintiffs here, who overlook a critical "caveat" in that opinion. The plaintiff in *Kurtz* (KRW) not only sued the agents, but was itself sued by the insurer. KRW alleged it had been damaged " 'in that it has lost the insurance protection it paid for; its officers and employees have been forced to expend time and effort searching for new insurance and defending KRW against Union's action; its officers . . . have been harassed and . . . sued; it has been forced to incur legal costs and other expenses in connection with this action; its creditworthiness has been injured; it has been exposed to potential liability in this action; and in other ways has suffered both general and special damages.' " (12 Cal.App.4th at p. 1256.)

In overruling summary judgment in favor of the agents, the *Kurtz* court recognized that the nature of the damages sought was critical to its determination: "Our caveat concerns KRW's damage claim. The cross-complaint includes an assertion that KRW was damaged 'in that it has lost the insurance protection it paid for.' " (12 Cal.App.4th at p. 1262.) "[W]ere [*plaintiff*] *seeking ERISA benefits from the* [*insurance agents*], *its claims would indeed be preempted.* (*Aetna Life Ins. Co.* v. *Borges* (2d Cir. 1989) 869 F.2d 142, 146.) If, however, KRW is not seeking such damages, preemption would further none of the purposes of the ERISA preemption provision." (12

Cal.App.4th at p. 1262, italics added.) Upon the plaintiff employer's assurance that it was not seeking to put the insurance agents in the position of an insurer, or to collect plan benefits from them, the *Kurtz* court allowed the plaintiff to amend its cross-complaint to eliminate the ambiguity by making it clear it was not seeking such benefits. (*Ibid.*) Hence, *Kurtz* holds that ERISA preemption does not apply to actions against agents acting for the insured *where the insured does not seek to put the agents in the position of the insurer by seeking ERISA benefits as damages. (Ibid.)*

Unlike *Kurtz*, plaintiffs here clearly seek to put the agents in the position of the insurer. Their damage claim is fundamentally a claim for recovery of unreimbursed medical expenses which they contend should have been paid by the insurer.[9] Although plaintiffs raise claims of negligent and intentional infliction of emotional distress, these claims are inextricably tied to injury

---

[9] The complaints filed by the Hendersons and plaintiff Hollingshead are virtually identical. The following allegations of the Henderson plaintiffs' first amended complaint (substantively the same as those in the Hollingshead complaint) make clear that plaintiffs seek recovery of medical benefits as damages:
*First Cause of Action—Negligence*:
"16. From approximately January 1991 through and including May 1991 [plaintiffs] did suffer from health care problems and did incur significant debts therefrom to health care providers for all attendant health care costs and services related thereto.
"20. As a proximate result of the acts of defendants and each of them, as herein alleged, [plaintiffs were] damaged in an amount according to proof for debts incurred for health care provided from approximately January 1, 1991, through and including May of 1991."
*Second Cause of Action—Fraud and Breach of Fiduciary Duties:*
"23. That as a result of said concealment of the true facts about PROMED, [plaintiffs] did rely on defendants as [a] fiduciary in [their] placement of his insurance coverage, paid all premiums for said coverage and ha[ve] been damaged by loss of insurance coverage in an amount subject to proof."
*Third Cause of Action—Breach of Oral Contract:*
"31. As a result of defendants' breach of contract, plaintiffs have incurred medical related debts which remain outstanding and unpaid in amounts according to proof at the time of trial."
*Sixth Cause of Action—Fraud and Deceit/Intentional Misrepresentation of Fact:*
"52. As a proximate result of defendants' fraud and deceit and the facts herein alleged, [plaintiffs were] damaged as is set forth below."
*Damages*:
"53. As a proximate result of defendants, acts and each of them, as alleged [in] the first through fifth causes of action, [plaintiffs] were injured in their health, strength and activity sustaining injuries to their nervous systems and persons, all of which have caused and continue to cause, plaintiffs great mental, physical and nervous pain and suffering. As a result of these injuries plaintiffs have suffered general damages in the jurisdiction of this court and in an amount according to proof at the time of trial.
"54. As a further proximate result of defendants' acts and each of them [plaintiffs have] been damaged in that [plaintiffs] have incurred obligations for medical costs and related services for the period of time from approximately January of 1991 through and including May of 1991 in an amount according to proof at the time of trial.
"55. As a further proximate result of defendants' acts and each of them plaintiffs have been damaged in that plaintiffs have sustained existing outstanding and unpaid medical bills

occasioned by the insurer's failure to reimburse medical expenses, as are the claims for punitive damages and attorney's fees. Consequently, even under the *Kurtz* court's analysis this action would be preempted.[10]

The trial court correctly found the claims against defendants are "related to" the essence of the ERISA plan.

## III.

In a one-page argument, with no citation to the record or to case authority, plaintiffs assert that defendants are not surplus line brokers and that by selling insurance underwritten by a nonadmitted carrier, defendants acted in violation of Insurance Code section 703, subdivision (a), and this action therefore should not be preempted. However, no allegation of the complaint raises any issue of noncompliance with the statute and no evidence whatsoever was presented to the trial court concerning this contention. "The appellate court will consider *only* those facts that were before the

beginning January of 1991 and continuing which have tarnished and diminished plaintiffs' reputation as financially responsible people and their goodwill and standing in the community and outside of their community which caused and continues to cause damage to plaintiffs in an amount according to proof at the time of trial.

"56. Furthermore, plaintiffs have suffered severe emotional distress. Said distress and emotional damage was reasonably foreseeable and was, in the contemplation of the parties, likely to result from the conduct of defendants and each of them as alleged above.

"57. The aforementioned conduct of defendants and each of them was willful and malicious and was intended to oppress and cause injury to plaintiffs. Plaintiffs are therefore entitled to an award of damages as is set forth below.

"WHEREFORE plaintiffs pray for judgment against defendants and each of them as follows:

"a. Plaintiffs pray for an award of actual damages for doctor, hospital and other medical expenses actually incurred and unpaid in an amount to compensate plaintiffs which will be proven at trial. b. Plaintiffs pray for an award to compensate them for their pain and suffering and for humiliation caused by defendants and each of them in conducting the acts alleged above in amount according to proof at the time of trial. . . ."

[10]We find the *Kurtz* caveat particularly applicable here where plaintiffs' claims necessarily flow from the unsoundness of the insurer, an event occurring a year after enrollment in the plan, not from any misrepresentation by the agent regarding insurability or from refusal of the APET to approve a claim. Plaintiffs here have not directly pled a fraud in the inducement cause of action. Nor do they directly allege they were induced to give up existing coverage by such misrepresentations. Cases following *Perkins* v. *Time Ins. Co., supra,* 898 F.2d 470, typically involve a misrepresentation that a preexisting condition was covered by the proposed insurance plan when in fact it was not covered, with the result that the employer was induced to give up existing coverage and a subsequent refusal by the insurer to pay benefits. (See, e.g., *Adorno* v. *Nitzkin* (N.D.Ill. 1993) 828 F.Supp. 42; *Barnet* v. *Wainman* (S.D.Fla. 1993) 830 F.Supp. 61; *Martin* v. *Continental Investors* (11th Cir. 1991) 934 F.2d 1265.) We do not here determine whether a claim for damages measured by the loss of insurance benefits would result in ERISA preemption of that claim where the insured's agent fraudulently induced the insured to give up existing coverage by misrepresenting the scope of coverage of the proposed plan.

trial court, and will disregard any new factual allegations on appeal. Facts not presented below cannot create a 'triable issue' on appeal." (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1994) ¶ 8:164, p. 8-64, citing *Sacks* v. *FSR Brokerage, Inc.* (1992) 7 Cal.App.4th 950, 962 [9 Cal.Rptr.2d 306].) We will not consider these allegations in our review of the summary judgment.

The judgments are affirmed. Each party shall bear its own costs on appeal.

Phelan, J., and Haerle, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 17, 1995.