Filed 5/10/18; pub. order 6/1/18 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PORT MEDICAL WELLNESS, INC., | B275874 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC497312 |
| v. | |
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ernest M. Hiroshige, Judge. Affirmed.

Shernoff Bidart & Echverria, William M. Shernoff, Travis M. Corby; Law Offices of Randy D. Curry, Randy D. Curry; The Arkin Law Firm and Sharon J. Arkin for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Richard J. Doren, Timothy W. Loose and Michael Holecek for Defendant and Respondent Connecticut General Life Insurance Company.

Seyfarth Shaw, D. Ward Kallstrom, Eric M. Steinert, Justin T. Curley; Leonard Carder, Peter Saltzman, Christine S. Hwang and Sara B. Tosdal for Defendants and Respondents ILWU-PMA Welfare Plan and ILWU-PMA Welfare Plan Board of Trustees.

---

## INTRODUCTION

Port Medical Wellness, Inc. (Port Medical) sued the International Longshore & Warehouse Union—Pacific Maritime Association Welfare Plan (Plan), its Board of Trustees (Board), and its former claims administrator, Connecticut General Life Insurance Company (Connecticut General), seeking payment for health care services provided to persons eligible for benefits under the Plan. The trial court granted summary judgment in favor of all defendants.[1]

State law causes of action seeking to recover unpaid benefits under a welfare benefit plan regulated under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.) are generally conflict preempted. We conclude that Port Medical's claims for breach of implied-in-fact contract, intentional misrepresentation and quantum meruit— each of which seeks payment for services covered under the Plan—are conflict preempted under section 514 of ERISA. Port Medical's two remaining claims—unfair competition (Bus. & Prof. Code, § 17200 et seq.) and intentional interference with prospective economic advantage—are not preempted because

---

[1]     We refer to the Plan, the Board, and Connecticut General collectively as defendants.

2

they are predicated on the theory that the Plan and Connecticut General conspired to force Port Medical out of business in order to benefit a competitor, rather than strictly on a claim for benefits under the Plan. Nevertheless, we conclude Port Medical failed to demonstrate there is a dispute of material fact with respect to those claims. Accordingly, we affirm the judgment in its entirety.

## FACTS AND PROCEDURAL BACKGROUND

### 1.    The Parties

#### 1.1.   The Plan and its Board of Trustees

The Plan is an employee benefit plan established and operated under ERISA that provides health and welfare benefits to members of the International Longshore and Warehouse Union (Union) and their beneficiaries.[2] The Board is the Plan's administrator as defined under ERISA and is the Plan's named fiduciary. The Plan and the Board do not administer claims for benefits under the Plan. Instead, the Plan contracts with a third party to administer benefit claims.

In addition, the Plan contracts with networks of health care providers that in turn contract with individual practitioners. As pertinent here, the Plan engaged Chiropractic Health Plan of California (Network) as its chiropractic provider network. The Plan covers 100 percent of the cost of covered services provided by Network providers.

---

[2]      We refer to the union members and their beneficiaries who are eligible for benefits under the Plan collectively as Plan members.

### 1.2. Connecticut General, the Plan's Third-Party Claims Administrator

Prior to the specific events which are the subject of the present suit, Great-West Life & Annuity Insurance Company (Great-West) administered medical benefits claims under the Plan. According to the contract between Great-West and the Plan, Great-West administered the claims as the Plan's agent. On April 1, 2008, Connecticut General's parent company acquired Great-West and Connecticut General became the administrator of the Plan. Connecticut General operated the Coastwise Claims Office (Coastwise) which received claims submitted by Port Medical.

As the Plan's administrator, Connecticut General processed medical benefit claims under the direction of the Plan, which retained the final responsibility for determining the Plan's claims liability. As part of its standard procedures, Connecticut General verified that patients were covered under the Plan and confirmed eligibility for the benefits requested. If Connecticut General determined that a claim related to benefits covered under the Plan, Connecticut General paid the claim using funds made available by the Plan.

After processing medical claims and making coverage and eligibility determinations, Connecticut General (through Coastwise) issued Explanation of Benefits forms (EOBs) which identified each service provided and the amount paid (if any) for each service. In some cases, Connecticut General denied claims and requested additional information about the services provided. As required under ERISA, Connecticut General sent EOBs to Plan members and their health care providers

4

explaining what medical services were approved for payment or denied and the reason(s) for any denial.

### 1.3. Port Medical

Port Medical was a chiropractic and medical provider with three office locations in the Los Angeles area. Port Medical was an in-network provider with the Network and nearly all of its patients were Plan members.

After treating Plan members, Port Medical submitted claims for its services to Coastwise. For approximately two years prior to the events at issue, Port Medical treated Plan members and submitted claims to Coastwise and, largely, the claims were paid.

## 2. Plan Coverage of Chiropractic Care

The Plan provides benefits for, among other things, chiropractic services. Generally, the Plan covers only 40 visits per calendar year. In addition, the Plan only provides a benefit for services deemed medically necessary.

## 3. Network Provider Agreement

Each of Port Medical's chiropractic practitioners joined the Network as a "participating practitioner," defined in the "Participating Practitioner Agreement" (network agreement) as "a duly licensed and/or certified practitioner of a healing art or arts or other professional services who, upon application and approval by [the Network], has agreed in writing to provide Covered Services to Members in accordance with the terms and conditions of this Agreement." As participating practitioners in the Network, Port Medical's chiropractors could make their services available to members of the Participating Payors who

contracted with the Network, including, as relevant here, the Plan. Per the network agreement, the Network contracted with "Participating Payor[s]," defined as "any organization that has a contractual obligation to provide Covered Services to Members and/or Member Groups."

The Network agreed, among other things, to market participating practitioners to Participating Payors. In return, the participating practitioners agreed "to provide professional services to Members in compliance with [the network agreement] and as set forth in Participating Payor Agreements and Member Agreements." As defined in the network agreement, a Participating Payor Agreement is an agreement "entered into by a payor and a Member and/or Member Group whereby Members and/or Member Groups may be eligible to receive Covered Services designated therein." A Member Agreement is defined as an agreement "entered into by a payor and an individual or group of individuals (Member Group) whereby individual(s) may be eligible to receive Covered Services designated therein." "Covered Services means any services which are specified by the terms of a Member Agreement for which Members are eligible."

Under the network agreement, participating practitioners agreed to comply with a range of conditions set forth in the Network's provider manual and with a quality assurance program monitored by the Network. Participating practitioners also authorized the Network to negotiate the reimbursement rate for practitioner services with each payor, and agreed to accept the reimbursement rate as payment in full for its services (with the exception of copayments, coinsurance and deductibles, which practitioners could collect directly from patients.) In addition, participating practitioners agreed to submit their bills to payors

6

or their designated representatives as specified in the Participating Payor Agreements.

Several specific provisions of the network agreement are at issue here:

"4.03 Participating Practitioner shall be responsible for the verification of the eligibility of Members and/or Member Groups to receive Covered Services prior to the initiation of the provision of professional services as specified in the Provider Manual.

"4.04 Participating Practitioner agrees to accept assignment of Member benefits as they apply to Covered Services and to obtain written acknowledgment from Members that Members are personally responsible for co-insurance, co-payments, deductibles and Non-Covered Services; Practitioner further agrees not to bill Members for professional services and/or supplies determined by Participating Payor or its designee as not Medically Necessary" subject to exceptions not relevant here.

"4.09 Participating Practitioner agrees to accept the lesser of Participating Practitioner's actual and accurate billed charges or the Reimbursement Rate as payment in full for Covered Services rendered to Members and not to seek additional payments or compensation from Members with the exception of co-insurance, co-payments and deductibles. Co-insurance, co-payments and deductibles must be collected and cannot be waived by Participating Practitioner. Participating Practitioner shall not bill for or collect from Member, payment for co-insurance, deductibles or Non-Covered Services prior to receipt of an explanation of benefits (EOB) from Participating Payor or its designee. Co-payments may be collected at the time of service. Participating Practitioner agrees not to 'balance bill' Members

7

except for applicable deductibles, co-insurance, co-payments, and Non-Covered Services in compliance with Article 4, Paragraph 4.04."

### 4.   Connecticut General's Investigation

In 2008, Great-West received an anonymous tip alleging Port Medical was billing the Plan for services not rendered. The subsequent investigation revealed suspicious billing activity. Connecticut General continued the investigation and eventually brought the matter to the attention of the Board. Connecticut General suggested it "flag" Port Medical and require it to submit medical records to support each of its claims. Consistent with this proposal, beginning in mid-2010, Connecticut General denied all claims submitted by Port Medical and requested supporting documentation. In some cases, Connecticut General denied claims because it determined the patient had already received the maximum number of chiropractic treatments covered by the Plan. And in other cases, the company denied claims because they were duplicative of claims previously submitted and denied. Connecticut General also issued EOBs directing Port Medical to provide additional information, such as MRIs and treatment notes, to support its claims. According to Port Medical, a large number of claims remain unpaid.

### 5.   Port Medical Demands Payment

By August 2010, Connecticut General was declining to pay virtually all of the claims submitted by Port Medical. Port Medical did not understand why its claims were suddenly being denied and it contacted Coastwise to determine the reason. Consistent with its EOBs, Coastwise instructed Port Medical to send additional medical documentation to support its claims.

Coastwise also indicated the denied claims were being audited. Port Medical ceased operations in September 2010, purportedly due to Connecticut General's failure to pay Port Medical's outstanding claims.

In September, October and November of 2010, Port Medical's counsel sent letters to the Plan and Connecticut General requesting payment on its claims.

### 6. Port Medical's Complaint

Port Medical filed its initial complaint in December 2012, naming Connecticut General and the union as defendants. Port Medical subsequently amended the complaint, dropping the union as a defendant and adding the Plan and its Board as defendants.

The operative complaint asserts five causes of action against the Plan: breach of implied-in-fact contract, intentional misrepresentation, services rendered (quantum meruit), unfair competition (Bus. & Prof. Code, § 17200 et seq.), and intentional interference with prospective economic relations. Port Medical asserted three of those causes of action—intentional misrepresentation, unfair competition, and intentional interference with prospective economic relations—against all three defendants. Port Medical alleges it is owed approximately $1.6 million in unpaid claims.

None of Port Medical's causes of action is expressly styled as a claim for benefits owed under the Plan. The first cause of action, "implied-in-fact breach of contract," alleges the network agreement between Port Medical and the Network prohibited Port Medical from billing Plan members for its services. Further, the Plan paid for services provided to Plan members according to the fee schedule set forth in the network agreement for several

9

years. According to Port Medical, these facts taken together created an implied-in-fact contract between the Plan and Port Medical that required the Plan to pay for services rendered to its members.

The second cause of action for intentional misrepresentation alleges defendants falsely represented that Port Medical's claims were "temporarily declined" or "denied pending receipt of additional documentation" when in reality they were purposefully, and wrongfully, withholding payment for reasons unrelated to coverage and eligibility under the Plan. Port Medical further alleges defendants intended for it to provide services to Plan members even though they had no intention of ever paying Port Medical for those services.

The third cause of action for "recovery of services rendered," alleges Port Medical "provided medically necessary treatments and services" to Plan members and that the Plan authorized Port Medical to perform those services. Further, the network agreement prohibits Port Medical from collecting payment for services from the Plan members. As a result, "the Plan became indebted to" Port Medical for the services provided to Plan members.

The fourth cause of action for unfair competition (Bus. & Prof. Code, § 17200 et seq.) alleges a variety of wrongful acts by defendants including failure to pay for services rendered to Plan members, failure to advise Port Medical that Connecticut General was conducting a fraud investigation, and conspiring to help Port Medical's competitor steal Port Medical's patients.[3]

---

[3]     Confusingly, the competing entity also used the name Port Medical. As a result, the plaintiff in this action began doing business

10

The final and fifth cause of action, for intentional interference with prospective economic relations, alleges defendants withheld payment on Port Medical's claims and conducted its fraud investigation in order to disrupt the relationship between Port Medical and its patients, to the benefit of Port Medical's competitor.

## 7.    Motions for Summary Judgment

The Plan and the Board, as well as Connecticut General, separately moved for summary judgment or, in the alternative, summary adjudication of Port Medical's claims.

### 7.1.   ERISA Conflict Preemption

Defendants argued that all of Port Medical's claims were preempted under section 514 of ERISA (29 U.S.C. § 1144(a)). Under that provision, state law claims that relate to a welfare benefit plan or the handling of claims for benefits under such a plan are preempted. The Plan argued that all of Port Medical's claims are in essence a challenge to the Plan's coverage determinations. Because Port Medical would need to prove entitlement to benefits under the Plan in order to prevail on its claims, they are preempted under ERISA. Connecticut General argued that each of Port Medical's claims against it was, at its core, based on alleged mishandling of claims for benefits due under the Plan and was therefore preempted.

Port Medical responded that coverage and eligibility under the Plan were not at issue. Rather, Port Medical claimed defendants denied all claims, covered or not, as part of a scheme

---

as Guru Medical. In order to avoid confusion, we refer to Port Medical's competitor as the competitor.

11

to put Port Medical out of business in order to assist one of its competitors. Further, Port Medical argued that ERISA regulates the relationships among employers, employees, and welfare benefit plans and therefore bars only state-law actions involving these relationships. Health care providers, such as Port Medical, stand outside those relationships and thus their claims are not subject to preemption.

### 7.2.   Statute of Limitations

Defendants also argued that Port Medical's causes of action for breach of implied-in-fact contract, services rendered, and intentional interference with prospective economic relations, were time-barred. Specifically, they noted Port Medical began complaining about claim denials in September 2010 and hired outside counsel to address its concerns with Connecticut General and the Plan in October 2010. By that point, they argued, Port Medical knew all the facts relevant to its claims and the two year statute of limitations began to run. But Port Medical filed its initial complaint in December 2012—more than two years after it knew of defendants' allegedly wrongful conduct—and did not add the Plan as a defendant until April 2013.

In response, Port Medical stated it had ongoing discussions with Connecticut General from October 2010 through April 2011, during which time Connecticut General assured Port Medical that it was conducting a routine audit and its denial of Port Medical's claims was temporary. Accordingly, Port Medical did not learn that its claims were denied until mid-2011, at the earliest.

### 7.3. Claims on the Merits

The Plan argued no implied-in-fact contract between itself and Port Medical existed. The course of conduct identified by Port Medical—the past payment of claims for benefits under the Plan—could not reasonably be used to infer an independent contract between the Plan and Port Medical. Port Medical responded that a triable issue of fact exists regarding the implied-in-fact contract claim because the Plan required it to enter into the network agreement if it wanted to continue treating Plan members and the network agreement required Port Medical to give up its right to seek payment for services from Plan members. Further, the Plan paid Port Medical in accordance with the fee schedules included in the network agreement for several years. Taken together, argued Port Medical, those facts would support a finding of an implied-in-fact contract between Port Medical and the Plan.

With respect to the intentional misrepresentation claim, the Plan noted that each misrepresentation identified by Port Medical was made by Connecticut General, not the Plan. For its part, Connecticut General argued there is no evidence that any of its statements were false. Specifically responding to the allegations that the EOBs falsely represented that Port Medical's claims would be paid, Connecticut General noted that the EOBs stated the claims were denied and Port Medical's corporate representative admitted no one at Connecticut General ever promised the claims would all be paid. Further, Connecticut General demonstrated that it had a legitimate basis to conduct its fraud investigation and asserted there is no evidence to support Port Medical's conspiracy theory.

13

Port Medical responded that Connecticut General misrepresented that it was denying claims pending the receipt of additional medical records which would allow it to make coverage determinations when in actuality it was denying all claims as part of an undisclosed fraud investigation. By failing to disclose the reason for the claim denials, defendants intended to (and did) induce Port Medical to continue to provide services to its Plan members.

As to Port Medical's claim for "services rendered," the Plan argued Port Medical could not establish necessary elements of the cause of action. Specifically, Port Medical would be unable to prove that the Plan asked Port Medical to provide services, or that Port Medical provided services to or for the benefit of the Plan (as opposed to Plan members.) Port Medical asserted defendants knowingly induced it to provide medical services to Plan members with full knowledge Port Medical might never be paid due to the ongoing (and undisclosed) fraud investigation.

All three defendants argued the unfair competition claim was predicated on the same allegations of unlawful conduct as the other claims, as to which there was no evidence. Further, Connecticut General argued no relief was available against it, as it was no longer the administrator for the Plan. Port Medical responded that the Plan and Connecticut General denied its legitimate claims in order to help a competitor steal its patients— the very essence of "unfair competition."

With respect to the intentional interference with prospective economic relations claim, Connecticut General asserted Port Medical would be unable to prove that its conduct— denying as well as investigating claims—was wrongful, inasmuch as it was properly discharging its duties to administer requests

14

for benefits under the Plan. Further, it argued there was no evidence Connecticut General intended to put Port Medical out of business or conspired to assist Port Medical's competitor, as alleged. Similarly, the Plan argued the only evidence supporting Port Medical's conspiracy theory was rumor and speculation, which was insufficient to survive summary judgment. The Plan also argued Port Medical did not have an economic relationship with its patients; rather, it had an economic relationship with the Plan, which paid for covered medical services.

Port Medical responded that Connecticut General instigated the fraud investigation in part to make itself look good in the eyes of the Plan by saving the Plan money. Connecticut General was aware that the Plan had concerns about its performance as its administrator and touted its fraud investigation as a means of saving the Plan millions of dollars every month.

### 8. Judgment and Appeal

The court granted defendants' motions for summary judgment. First, the court rejected their argument that Port Medical's claims were preempted under ERISA. Specifically, the court found "[t]he gravamen of Plaintiff's complaint is that Plan Defendants had paid Plaintiff for several years under predetermined fee schedules, but suddenly stopped, and that Plaintiff continued to provide medical services to [Plan] members based on Defendants' prior payment history…. Thus, while Plaintiff's claim may refer to the Plan, it does not rely on it." The court also concluded that because Port Medical was in active discussions with Connecticut General about its pending claims and continued to receive EOBs into 2012, there was a triable issue of fact whether Port Medical's claims were time-barred.

15

With respect to the implied-in-fact contract claim, the court examined the network agreement relied upon by Port Medical. Although the court noted there was some evidence that the Plan may have pressured Port Medical into entering into the network agreement, that evidence did not tend to show that the Plan impliedly agreed to a contract with Port Medical, independent of its obligation to Plan members. Moreover, the court explained, the terms of the network agreement prohibit implied contracts—a point Port Medical did not dispute.

The court also concluded there was no dispute of material fact regarding Port Medical's intentional misrepresentation claim. Specifically, the court found no evidence to support the claim that Connecticut General intended to deny Port Medical's claims even if it eventually determined the claims related to services covered under the Plan. Accordingly, no evidence supported Port Medical's assertion that the EOB denials accompanied by requests for documentation were false. And because Port Medical's claim was premised on statements and acts by Connecticut General, Port Medical could not maintain the misrepresentation claim against the Plan or the Board.

As to Port Medical's quantum meruit claim, the court noted that in order to recover under that theory, a plaintiff must show he was acting under an express or implied request for services and the services rendered were intended to and did benefit the defendant. Here, however, it is undisputed that defendants did not request any services from Port Medical.

In addition, the court concluded Port Medical could not prevail against defendants on its claim for intentional interference with prospective economic relations. After noting that Port Medical alleged defendants interfered with its

16

relationships with its patients, the court observed that Port Medical received all its payments for services from the Plan—not from Plan members. The court concluded the only economic relationship at issue was between Port Medical and the Plan. And the Plan could not, as a matter of law, interfere with its own economic relationships.

Finally, the court found Port Medical's unfair competition claim failed because it was based on the same allegedly wrongful acts as the other four causes of action, as to which the court had already granted summary judgment.

The court entered judgment in favor of defendants on May 23, 2016. Port Medical timely appeals.

## DISCUSSION

Port Medical complains the trial court erred in granting defendants' motions for summary judgment. Although our analysis is slightly different than that of the trial court, we reach the same result and conclude summary judgment was proper as to all defendants.

### 1. Standard of Review

The applicable standard of review is well established. "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) As such, the summary judgment statute (Code Civ. Proc., § 437c), "provides a particularly suitable means to test the sufficiency of the plaintiff's prima facie case and/or of the defendant's [defense]." (*Caldwell v. Paramount Unified School Dist.* (1995) 41

Cal.App.4th 189, 203.) A summary judgment motion must demonstrate that "material facts" are undisputed. (Code Civ. Proc., § 437c, subd. (b)(1).) The pleadings determine the issues to be addressed by a summary judgment motion. (*Metromedia, Inc. v. City of San Diego* (1980) 26 Cal.3d 848, 885, revd. on other grounds by *Metromedia, Inc. v. San Diego* (1981) 453 U.S. 490; see *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 74.)

The moving party "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar, supra,* 25 Cal.4th at p. 850, fn. omitted.) A defendant moving for summary judgment must " 'show[ ] that one or more elements of the cause of action … cannot be established' by the plaintiff." (*Id.* at p. 853 [quoting Code Civ. Proc., § 437c, subd. (o)(2)].) A defendant meets its burden by presenting affirmative evidence that negates an essential element of plaintiff's claim. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) Alternatively, a defendant meets its burden by submitting evidence "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" supporting an essential element of its claim. (*Aguilar, supra,* 25 Cal.4th at p. 855.)

On appeal from summary judgment, we review the record de novo and independently determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 (*Saelzler*); *Guz, supra,* 24 Cal.4th at p. 334.) We resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment. (*Saelzler,* at p. 768.)

In performing an independent review of the granting of summary judgment, we conduct the same procedure employed by

the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to decide whether the opposing party has demonstrated the existence of a triable, material fact issue. (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 629–630.) We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. (*Ibid.*)

"The interpretation of ERISA, including whether ERISA preempts state law, is a question of law which we review de novo." (*In re Marriage of Padgett* (2009) 172 Cal.App.4th 830, 839; *Morris B. Silver M.D., Inc. v. International Longshore & Warehouse etc.* (2016) 2 Cal.App.5th 793, 798 (*Silver*).)

## 2.    The court properly granted summary judgment in favor of defendants.

In the operative pleading, Port Medical avoids stating directly that it is seeking payment for medical services rendered to Plan beneficiaries. Nevertheless, even Port Medical acknowledges that is the core of its case. Port Medical alleges its practitioners treated Plan members, rendered services covered by the Plan, and that it has not been paid fees of approximately $1.6 million attributable to those services. As we will explain, state law claims for benefits under an ERISA welfare benefit plan are preempted by ERISA under the doctrine of conflict preemption.[4]

---

[4]    Port Medical asserts defendants may not raise arguments relating to ERISA or the statute of limitations because they did not file a cross-appeal. Not so. As defendants were not aggrieved by the

19

ERISA provides that civil actions may be brought by plan participants, beneficiaries, fiduciaries, and the United States Secretary of Labor. (29 U.S.C. § 1132(a).) Typically, a health care provider in Port Medical's position would bring a claim for benefits under ERISA in a derivative capacity (standing in the shoes of the patient) under an assignment of reimbursement rights. (*Misic v. Building Service Employees Health* (9th Cir. 1986) 789 F.2d 1374, 1377–1379 [health care provider with valid assignment of benefits has standing to sue under ERISA].) The Ninth Circuit explained how such assignments further the goal of ERISA:

> "Health and welfare benefit trust funds are designed to finance health care. Assignment of trust monies to health care providers results in precisely the benefit the trust is designed to provide and the statute is designed to protect. Such assignments also protect beneficiaries by making it unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment, and by eliminating the necessity for beneficiaries to pay potentially large medical bills and await compensation from the plan. Moreover, assignments permit a trust fund to obtain improved benefits for beneficiaries by bargaining with health care providers for better coverage and lower rates."

(*Id.* at p. 1377.)

Here, Port Medical's assertions to the contrary notwithstanding, the provider agreement Port Medical's

---

judgment in their favor, they had no standing to appeal. Further, as our review is de novo, we may address any argument raised below, even if it did not form the basis of the court's ruling.

practitioners signed provides for such an assignment. ("Practitioner agrees to accept assignment of Member benefits as they apply to Covered Services … .") For whatever reason, Port Medical did not bring a derivative claim for benefits under ERISA. Instead, it asserted contract and tort claims against the Plan and Connecticut General which it contends fall outside the scope of ERISA conflict preemption. Yet " 'ERISA preemption extends even to state common-law causes of action that "do not explicitly refer to employee benefit plans." [Citation.] Thus, many courts have found preemption where the plaintiff's claims, although formed under theories of state common-law, were really ways of restating claims for employee benefits governed by ERISA. [Citations.]' [Citation.] If ERISA claims are pleaded as state law claims, they must be tried under federal law 'when stripped of their state law disguises.' [Citation.]" (*AT&T Communications, Inc. v. Superior Court* (1994) 21 Cal.App.4th 1673, 1678, first and second brackets in original.)

We briefly discuss conflict preemption under ERISA and then, to the extent any of Port Medical's claims or theories are not preempted, we consider whether the court properly granted summary judgment.

### 2.1. Conflict Preemption Under Section 514 of ERISA

"ERISA is a comprehensive federal law designed to promote the interests of employees and their beneficiaries in employee pension and benefit plans. [Citation.] As a part of this integrated regulatory system, Congress enacted various safeguards to preclude abuse and to secure the rights and expectations that ERISA brought into being. [Citations.] Prominent among these safeguards is an expansive preemption provision, found at section 514 of ERISA (29 U.S.C. § 1144; [citations].)" (*Marshall v.*

21

*Bankers Life & Casualty Co.* (1992) 2 Cal.4th 1045, 1050–1051 (*Marshall*); see *Aetna Health Inc. v. Davila* (2004) 542 U.S. 200, 208 ["The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, [citation], which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.' "].)

ERISA has two distinct preemption provisions: Preemption under section 514 (29 U.S.C. § 1144), known as conflict or ordinary preemption; and so-called complete preemption under section 502(a) (29 U.S.C. § 1132(a)). Complete preemption is a doctrine that recognizes federal jurisdiction over what would otherwise be a state law claim, an issue that typically arises when the defendant has removed the plaintiff's state court lawsuit to federal court. Conflict preemption—our focus here—is an affirmative defense to a plaintiff's state law cause of action that entirely bars the claim; that is, the particular claim involved cannot be pursued in either state or federal court. (*Silver, supra,* 2 Cal.App.5th at p. 799.)[5]

Section 514(a) of ERISA provides, in relevant part: "Except as provided in subsection (b) of this section, the provisions of [titles I and IV of ERISA] shall supersede any and all State laws insofar as they may now or hereafter *'relate to'* any employee benefit plan ...." (29 U.S.C. § 1144(a), italics added.) Initially, the Supreme Court interpreted the "relate to" language very broadly, holding, "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or

---

[5]     We adopt this opinion, recently published by our colleagues in Division Seven of this Court, in significant part.

22

reference to such a plan." (*Shaw v. Delta Air Lines, Inc.* (1983) 463 U.S. 85, 96–97; see *Ingersoll–Rand Co. v. McClendon* (1990) 498 U.S. 133, 139 (*Ingersoll–Rand*) ["[u]nder this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect"].)

The Supreme Court subsequently recognized the difficulty of reconciling such a broad and potentially limitless definition with the competing presumption that Congress generally does not intend to supplant state law. To that end, the Court later concluded it "simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." (*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 656 (*Travelers*) [holding New York statute requiring hospitals to collect surcharges from patients covered by a commercial insurer but not from patients insured by a Blue Cross/Blue Shield plan or certain health maintenance organizations was not preempted]; see *Gobeille v. Liberty Mut. Ins. Co.* (2016) —— U.S. —— [136 S.Ct. 936, 943] ["In *Travelers,* the Court observed that '[i]f "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course.' [Citation.] That is a result 'no sensible person could have intended.' "].) The *Travelers* court explained that Congress's intent in enacting section 514(a) was " 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and

the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.' " (*Travelers*, at pp. 656–657; see *Silver, supra*, 2 Cal.App.5th at p. 800.)

Applying the doctrine of conflict preemption, the Supreme Court has held common law causes of action brought by an ERISA plan participant or beneficiary "based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under § 514(a)." (*Pilot Life Ins. Co. v. Dedeaux* (1987) 481 U.S. 41, 48 [action by an employee against employer's disability insurance provider]; see *Marshall, supra,* 2 Cal.4th at p. 1049 [action seeking state law remedies for improper denial of benefits preempted]; *Hollingshead v. Matsen* (1995) 34 Cal.App.4th 525, 541–542 [state law claims by plan participants and administrator of estate of plan participant against insurance agency and agent, including negligent and intentional infliction of emotional distress, were "fundamentally a claim for recovery of unreimbursed medical expenses" and thus preempted by ERISA].) The touchstone of conflict preemption analysis is the purpose of section 514(a): "ERISA's comprehensive preemption of state law affords employers the advantages of a uniform set of regulations governing plan fiduciary responsibilities and governing procedures for processing claims and paying benefits." (*Memorial Hosp. System v. Northbrook Life Ins. Co.* (5th Cir. 1990) 904 F.2d 236, 245 (*Memorial Hospital*).)

"Even before the Court recognized in *Travelers* its interpretation of the 'relate to' language was too broad to provide meaningful limits, it had recognized that '[s]ome state actions

24

may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan.' [Citations.] Additionally, 'relatively commonplace' 'lawsuits against ERISA plans for run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan' are not preempted even though they 'obviously affect[ ] and involve[ ] ERISA plans and their trustees.' [Citation.]" (*Silver, supra*, 2 Cal.App.5th at p. 802.) Port Medical argues its claims fall into this category.

Several federal circuit courts have recognized that, in limited circumstances, claims by third-party health care providers may not be preempted under ERISA. The leading case on point is *Memorial Hospital*. There, the plaintiff hospital relied on representations by the defendant employer and the employer's insurer that a new employee's wife was covered by the insurance plan and "would not have extended treatment to her without such an assurance of payment." (*Memorial Hospital, supra,* 904 F.2d at p. 238.) The health insurer later denied the hospital's request for payment because the new employee had not yet worked for the employer for 30 days and, as a result, his wife was ineligible for health care benefits. The hospital filed a state court action against the employer and insurer asserting several state law claims including breach of contract as an assignee of a plan beneficiary seeking recovery of plan benefits. It also asserted a claim for deceptive and unfair trade practices under the Texas Insurance Code, essentially a codified claim for negligent misrepresentation, in its independent capacity as a third-party health care provider. After the lawsuit was removed to federal court, the district court dismissed the claims for breach of contract and deceptive trade practices on preemption grounds

25

and remanded the remaining pendent state law claims to state court. (*Id.* at pp. 238–239.) The Court of Appeals for the Fifth Circuit affirmed the portion of the judgment dismissing the breach of contract claim but vacated that portion of the judgment dismissing the deceptive trade practices claims and remanded it to the state court. (*Id.* at p. 239.)

In holding the deceptive trade practices claim was not preempted, the *Memorial Hospital* court, reading "the preemption clause of ERISA ... in context with the Act as a whole, and with Congress's goal in creating an exclusive federal enclave for the regulation of benefit plans," found cases holding state law claims conflict preempted under ERISA had "at least two unifying characteristics: (1) the state law claims address areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." (*Memorial Hospital, supra,* 904 F.2d at pp. 244–245, fn. omitted.) The court concluded the hospital's misrepresentation claim did not implicate either of those two factors.

With respect to the first factor, the court described the "commercial realities" health care providers face: Healthcare is expensive, and providers have limited budgets for indigent care and losses due to nonpayment. They routinely determine before deciding to treat a patient whether they can reasonably expect payment and must rely on an insurance company or plan administrator's representations. (*Memorial Hospital, supra,* 904 F.2d at p. 246.) The court explained: "If providers have no recourse under either ERISA or state law in situations such as

the one *sub judice* (where there is no coverage under the express terms of the plan, but a provider has relied on assurances that there is such coverage), providers will be understandably reluctant to accept the risk of non-payment, and may require up-front payment by beneficiaries—or impose other inconveniences—before treatment will be offered. This does not serve, but rather directly defeats, the purpose of Congress in enacting ERISA." (*Id.* at pp. 247–248.) Moreover, "[i]f a patient is not covered under an insurance policy, despite the insurance company's assurances to the contrary, a provider's subsequent civil recovery against the insurer in no way expands the rights of the patient to receive benefits under the terms of the health care plan. If the patient is not covered under the plan, he or she is individually obligated to pay for the medical services received…. A provider's state law action under these circumstances would not arise due to the patient's coverage under an ERISA plan, but precisely because there is no ERISA plan coverage." (*Id.* at p. 246.)

With respect to the second factor, the court explained it had previously found "the most important factor for a court to consider in deciding whether a state law affects an employee benefit plan 'in too tenuous, remote, or peripheral a manner to be preempted' is whether the state law affects relations among ERISA's named entities. '[C]ourts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—than if it affects relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan.' " (*Memorial Hospital, supra,* 904 F.2d at p. 249.) Because third-

party providers are not parties to the bargain "struck in ERISA" between plaintiffs and employers, the court concluded Congress could not have "intended the preemptive scope of ERISA to shield welfare plan beneficiaries from the consequences of their acts toward non-ERISA health care providers when a cause of action based on such conduct would not relate to the terms or conditions of a welfare plan, nor affect—or affect only tangentially—the ongoing administration of the plan." (*Id.* at pp. 249–250.)

Another case cited by Port Medical, this one from the Ninth Circuit, illustrates a similar point. In *Blue Cross of California v. Anesthesia Care Assoc.* (9th Cir. 1999) 187 F.3d 1045 (*Blue Cross*), a group of medical providers sued Blue Cross over a fee dispute relating to an ERISA health care plan. Each of the providers had entered into a "Participating Physician Agreement" with Blue Cross. (*Id.* at p. 1048.) Blue Cross promoted the physicians to its plan members as preferred providers and, in turn, the physicians agreed to accept payment from Blue Cross for services rendered to plan members according to specified fee schedules. (*Ibid.*) As in the present case, the plan members in *Blue Cross* were almost entirely removed from the billing process. (*Ibid.*) In the participating physician agreements, the providers agreed to " 'accept and maintain evidence of assignment for the payment of Medical Services provided to Members by PHYSICIAN under the applicable' " Plan. (*Ibid.*) The physicians also agreed to seek payment only from Blue Cross and to accept the fees listed in the agreement as payment in full for all medical services provided to plan members. (*Ibid.*)

The dispute arose when Blue Cross allegedly changed the fee schedules. According to the physicians, Blue Cross breached the participating physician agreements by improperly amending

28

the fees schedules and violated the implied duty of good faith and fair dealing under California law. Blue Cross filed petitions to compel arbitration in federal district court; the physicians responded by filing a joint class action in state court. Blue Cross removed the case to federal court and moved to dismiss the physicians' claims under ERISA section 502(a) (complete preemption) and, alternatively, under ERISA section 514(a) (conflict preemption).

The district court concluded the physicians' claims were not preempted by ERISA under either provision and the Ninth Circuit affirmed. As pertinent here, the court observed that the physicians were not litigating entitlement to benefits under a welfare benefit plan as assignees of the plan members—the core area of concern with respect to ERISA preemption. Instead, the providers' claims arose from their independent contracts with Blue Cross which set their fees—contracts not subject to regulation by ERISA because they involve only the fee for a physician's services, not the entitlement to benefits under a regulated welfare benefit plan. "[B]ecause the Providers' claims arise from contracts that a health care provider makes with its medical providers, the difficulties that Congress sought to avoid with ERISA's preemption clause are not implicated here. The state law that the Providers invoke does not create an alternative enforcement mechanism for securing benefits under the terms of ERISA-covered plans." (*Blue Cross, supra*, 187 F.3d at p. 1054.) Stated differently, the parties all agreed the physicians provided medical services covered under the plan at issue. The dispute related to the rate of pay, which was the subject of the "Participating Physician Agreement" between Blue Cross and the plaintiff physicians—not the ERISA plan.

Stated simply, these cases (and others cited therein) stand generally for the proposition that a health care provider that treats a beneficiary of a welfare benefit plan may assert a claim in state court against the plan if it is based on an obligation between the plan and the provider separate from the welfare benefit plan itself and does not inquire into entitlement to benefits under the plan. Thus, where a plan assures a provider that a proposed treatment is covered under the plan but later determines it is not covered, the provider may sue based upon the plan's *independent promise* to the provider to pay for the services rendered. And where a provider has an agreement with a welfare benefit plan directly, it may sue for breach of *that* agreement, notwithstanding the fact that it relates generally to the provision of services under an ERISA plan.

With these principles in mind, we now review Port Medical's causes of action to determine whether, and to what extent, Port Medical's claims avoid conflict preemption under ERISA.

### 2.2. Three of Port Medical's causes of action are conflict preempted under ERISA.

### 2.2.1. Breach of Implied-In-Fact Contract

Port Medical contends there is a dispute of material fact as to whether an implied-in-fact contract exists between the Plan and Port Medical obligating the Plan to pay Port Medical for healthcare services Port Medical provided to Plan members. We conclude this cause of action is fundamentally a claim for benefits under ERISA and is therefore preempted under section 514(a) of ERISA.

30

A contract is either express or implied. (Civ. Code, § 1619.) The terms of an express contract are stated in words. (Civ. Code, § 1620.) By contrast, the existence and terms of an implied contract are manifested by conduct. (Civ. Code, § 1621.) "The distinction reflects no difference in legal effect but merely in the mode of manifesting assent. [Citation.] Accordingly, a contract implied in fact 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' [Citation.]" (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178.)

Port Medical's implied contract theory, as we understand it, begins with the network provider agreement signed by its practitioners. Port Medical acknowledges the network agreement is not a contract that binds the Plan, but asserts "that contract established the parameters of the relationship between [Port Medical] and the Plan: If [Port Medical] provided healthcare services to the Plan's members, the Plan would reimburse [Port Medical] for those services at established rates." It then urges an implied-in-fact contract between Port Medical and the Plan arose because "[Port Medical] *did* provide healthcare services to the Plan's members for over two years before the present dispute arose, and *the Plan paid* [*Port Medical*] *the reimbursements as set forth in the* [*network*] *agreement*." (Original italics.) Based on that course of conduct, Port Medical asserts, a jury could reasonably find an implied-in-fact contract arose between Port Medical and the Plan.

The Plan argues this cause of action is conflict preempted under ERISA because it is predicated on the Plan's history of paying claims for benefits due under the Plan. Moreover, the

31

Plan asserts, Port Medical's implied contract claim is fundamentally a claim for unpaid ERISA plan benefits—the precise type of claim section 514(a) of ERISA preempts. We agree.

Although Port Medical ignores the existence of the Plan in pleading its implied contract cause of action, we do not. Stated simply, the Plan is obligated to reimburse its members for the cost of covered health care services. As a convenience to Plan members, and in exchange for "preferred provider" status, Port Medical agreed in the network agreement to bill the Plan (through its administrator, Connecticut General) for covered services provided to Plan members and to accept the Plan's payment as full compensation for the services it provided. Thus, the Plan, through Connecticut General, pays Port Medical because—and only because—it is obligated to reimburse *Plan members* for the cost of covered healthcare services. The fact that Port Medical agreed to bill the Plan after providing services to Plan members, rather than requiring Plan members to pay for services at the time they are rendered and leaving them to seek reimbursement from the Plan, does not alter the fundamental nature of the Plan's obligations *to its members*.

Having now clarified the nature of the obligation at issue, it is plain that Port Medical's implied contract cause of action is fundamentally a claim for unpaid ERISA plan benefits. The network agreement, which Port Medical contends "established the parameters of the relationship between [Port Medical] and the Plan," expressly relates to the provision of covered healthcare services to Plan members. The recitals at the beginning of the network agreement state the "Practitioner desires to make professional services available to Members … of Participating Payors" such as the Plan, the Network "provides administrative

services including management tools for the provision of Covered Services to Members … of Participating Payors," and the Network contracts with "Participating Payors who execute Member Agreements with Members and/or Member Groups for the provision of Covered Services." Moreover, the provisions relating to payment for healthcare services, quoted in full *ante*, all anticipate that practitioners are providing covered services to members of a welfare benefit plan and that practitioners will bill either the plan or its designee (here, Connecticut General) for the cost of those services.

In short, despite Port Medical's creative pleading, it is apparent that this cause of action is fundamentally a claim for unpaid benefits under an ERISA plan and it is therefore preempted under section 514(a) of ERISA.

### 2.2.2. Intentional Misrepresentation

Port Medical also asserts disputes of material fact exist regarding its intentional misrepresentation claim. We conclude this claim is also conflict preempted under ERISA.

The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) Here, Port Medical contends defendants made misrepresentations by asserting that the delay in paying Port Medical's claims was due to a " 'routine audit' " when in fact Connecticut General was engaged in a fraud investigation, and issuing EOBs that contained "half truth[s]," in that the EOBs suggested Port Medical's claims would be paid if Port Medical submitted the requested documentation when in fact defendants always intended to deny Port Medical's valid

claims. According to Port Medical, it reasonably relied on these misrepresentations when it continued treating Plan members despite nonpayment of its claims.

On the issue of preemption, *Silver* is of assistance. *Silver* is similar to *Memorial Hospital*, discussed *ante*, in that it involved a claim by a doctor who rendered services to a patient based on the assurance of coverage by a welfare benefit plan. When the plan later denied the claim, the doctor sued in state court, asserting claims for breach of oral contract, promissory estoppel and quantum meruit. Relying on *Memorial Hospital*, our colleagues in Division Seven of this court found the doctor's claims were not preempted under ERISA because the causes of action were based upon the plan's misrepresentation of coverage, not entitlement to benefits under the plan. (*Silver*, *supra*, 2 Cal.App.5th at pp. 806–808.)

Of interest here, however, the doctor also asserted a cause of action for intentional interference with contractual relations. According to the doctor, the plan interfered with his contractual relationship with his patients by sending the patients EOBs indicating that their total financial responsibility for the services rendered by the plaintiff was zero. (*Silver*, *supra*, 2 Cal.App.5th at p. 808.) In considering whether the cause of action was "related to" an ERISA plan, and therefore conflict preempted, the court observed that an EOB, or something similar, is required under ERISA. (*Ibid.*; see 29 U.S.C. § 1133 [requiring "adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant"].) However, the doctor asserted (in an attempt to avoid preemption) his claim was predicated not on

34

the EOB, but on "the Plan's extraneous tortious conduct of improperly directing policyholders in the EOB to disregard their financial obligations to Silver." (*Silver*, at p. 808.) The court rejected that argument because "the Plan's allegedly tortious conduct cannot be separated from the Plan's discharge of its obligations to notify participants of an adverse determination under ERISA.… The Plan's alleged interference with contractual relations was accomplished not by an individual advising policyholders not to pay Silver, but instead by the manner in which its preprinted EOB was designed, completed and potentially interpreted …. Whether use of the form essentially constituted a tort—a question with wide-ranging implications for any plan using a similar form—is precisely the kind of decision that conflict preemption is intended to eliminate …." (*Id.* at p. 809.)

We agree with the court's analysis in *Silver* and, applying that reasoning here, we conclude Port Medical's intentional misrepresentation claim is conflict preempted under ERISA. Port Medical contends Connecticut General's EOBs contained "half-truths," because they denied Port Medical's claims and requested further documentation. But the statements contained in the EOBs are, as the court explained in *Silver*, inseparable from Connecticut General's duty to provide a written explanation of claim denials under ERISA.

We reach a similar conclusion regarding Connecticut General's statements that it was conducting a routine audit of Port Medical's claims although it was actually reviewing all of Port Medical's submissions to determine whether Port Medical was engaging in fraud. As we have said, a misrepresentation claim is not preempted if a plan or administrator makes a

35

representation to a healthcare provider that services will be covered, the provider relies on that representation and provides services, and the plan later denies a reimbursement claim after determining the services are not covered. (*Memorial Hospital, supra*, 904 F.2d at p. 250; *Silver, supra*, 2 Cal.App.5th at pp. 805–806.) In that instance, the provider's suit does not relate to the ERISA plan precisely because the services provided *are not covered* under the plan. Instead, the provider's suit relates to the misrepresentation of coverage upon which the provider relied to its detriment in providing healthcare services to the plan member. But here, Port Medical seeks to hold defendants liable for Connecticut General's failure to disclose that it was conducting an internal investigation into Port Medical's billing practices. That activity by Connecticut General goes to the core of the claims handling function and as such, is conflict preempted.

### 2.2.3. Quantum Meruit

Port Medical also asserted a cause of action entitled "services rendered," which appears to be an equitable claim for quantum meruit. "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.] To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' [citations]." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458.) The requisite elements of quantum meruit are (1) the plaintiff acted pursuant to "an explicit or implicit request for the services" by the defendant, and (2) the services conferred a benefit on the

defendant. (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 249.)

Of all Port Medical's causes of action, this one is most plainly preempted under ERISA. According to the operative complaint, Port Medical "provided medically necessary treatments and services to [Plan] members," the treatments were authorized by the Plan, "[a]s a result, the Plan became indebted to [Port Medical] for the services rendered by [Port Medical] to [Plan] members," and "the Plan unilaterally decided to deny payment" to Port Medical.

The present case is unlike *Memorial Hospital*, in which a healthcare provider's misrepresentation claim was not preempted. There, the plan assured a health care provider that its fees would be paid but later denied the request for payment because the services were not covered by the plan. Here, the opposite is true. Port Medical contends it provided covered services to Plan members and now seeks payment for those services.

This case is also unlike *Blue Cross*, in which the dispute concerned the rate of pay set forth in the participating provider agreement. There, it was undisputed that the providers rendered covered services and the only issue was the manner in which Blue Cross amended the participating provider agreements which set the providers' rate of pay. Here, by contrast, Port Medical seeks payment on claims for Plan benefits which Connecticut General rejected, but which Port Medical contends should have been paid because they concerned covered services.

Finally, and as we have said, state law claims creating an alternative enforcement mechanism to secure benefits under the terms of ERISA-covered plans are preempted. (See *Blue Cross,*

*supra*, 187 F.3d at p. 1054.) It is difficult to imagine a more apparent claim for unpaid benefits under an ERISA plan than Port Medical's quantum meruit claim.

### 2.3. Port Medical's remaining causes of action are not preempted. Summary judgment was proper on those claims.

### 2.3.1. As alleged, the causes of action for unfair competition and intentional interference with prospective economic relations are not conflict preempted under ERISA.

Port Medical's remaining theory of liability is hinted at throughout the complaint but is most directly presented in the causes of action for unfair competition and intentional interference with contractual relations. There, Port Medical alleges the Plan and Connecticut General refused to pay legitimate, covered claims because they were conspiring to put Port Medical out of business. According to Port Medical, the Plan and Connecticut General embarked on this campaign against Port Medical in order to assist another chiropractic provider (not coincidentally run by persons affiliated with the union) in stealing Port Medical's patients. Further, Port Medical asserts Connecticut General gave it the impression its claims would eventually be paid in order to induce Port Medical to continue treating Plan members, even though defendants planned to deny the claims Port Medical would later submit for those services. Because Port Medical treated Plan members almost exclusively and Connecticut General was not paying any of Port Medical's claims, Port Medical generated no income for an extended period and it eventually went out of business.

Although the scope of ERISA's conflict preemption provision is broad, we do not believe it was meant to shield welfare benefit plans and administrators from liability for intentional torts of the type pled in this case. As we have said, welfare benefit plans may be sued for garden-variety torts unrelated to claims for benefits under an ERISA plan. And these torts, as alleged, involve intentional acts well beyond claims evaluation and processing. As defendants point out, however, Port Medical would need to establish that defendants refused to pay legitimate claims for benefits covered under a welfare benefit plan in order to prevail. But that does not necessarily mean the causes of action "relate to" an ERISA plan. The focus of these causes of action is the tortious withholding of payment for the purpose of inflicting financial harm on a medical provider, to the benefit of a competitor. Surely Congress did not intend to shield welfare benefit plans from liability for such conduct. Accordingly, we conclude these causes of action are not conflict preempted and we proceed to analyze whether the court properly granted summary judgment.

### 2.3.2. There is no evidence defendants intentionally withheld payment on valid claims in order to benefit Port Medical's competitor.

To prevail on a claim for unfair competition, a plaintiff must show an "unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) According to Port Medical, defendants violated this statute by "implicitly" assuring Port Medical "that if they provided healthcare services to the Plan's members, they would be paid according to the rates set forth in the [network provider] agreement between [Port Medical] and [the Network]—and actually did so for a period of years." Stated

slightly differently, "defendants continued to imply to [Port Medical] that its claims would be paid once additional documentation was submitted when, in fact, defendants were conducting a fraud investigation and had no intention of paying any claims at all—even claims that were being incurred on an on-going basis."

Port Medical's intentional interference cause of action has a similar foundation. The elements of the tort of intentional interference with prospective economic advantage are (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.) The operative complaint alleges "Defendants engaged in wrongful conduct by misrepresenting to Port Medical Wellness that it was temporarily declining payment of claims pending receipt of medical records when it knew it already had the requested information; by secretly sending all of Port Medical Wellness's claims to its SIU department without informing Port Medical Wellness; by unlawfully failing to timely pay claims according to the Participating Practitioner Agreement; by continuing to pay Port Medical Wellness for benefits already provided to [Plan] members according to the Participating Practitioner Agreement [*sic*]; and by conspiring to help [a union] affiliated company steal Port Medical Wellness's patients."

As to both causes of action, there are at least two critical facts Port Medical must establish to prevail under the theory it

advances: defendants assured Port Medical it would be paid on all its claims, and defendants intended to withhold payment on all Port Medical's claims without regard to their validity. There is no evidence to support either of these contentions.

Regarding assurances of payment, it is undisputed that Port Medical received no oral assurances of payment from Connecticut General or Coastwise. Specifically, Stella Redenski, Port Medical's office manager, testified about her interactions with Coastwise, Connecticut General's claims processing office. And she admitted Coastwise never told her Port Medical's claims would be paid: "Nobody told me that I'm not going to get paid or that I will get paid. No one instructed me one way or another."

Moreover, the written assurances of payment Port Medical points to are EOBs plainly stating *the claims were denied*. In all cases, the EOBs state that the billed services are "not covered" and provide a code indicating the reason for that determination. The reasons provided were that the patient exceeded the permitted 40 annual visits, the billed services had already been billed and denied, or additional medical records were needed to substantiate the claim. Furthermore, representatives from Port Medical confirmed that the EOBs denied the claims and did not promise to pay the claims at a later time. Although the request for additional documents leaves open the possibility that the claim might be paid in the future, no reasonable person could construe the EOBs denying Port Medical claims as assurances, express or implicit, that the rejected claims would definitely be paid if additional documentation was provided.

In any event, there is no evidence defendants intended to withhold payment on valid claims for *any* reason, or specifically in order to help Port Medical's competitor steal Port Medical's

41

patients. There is no evidence of any contact between the competitor and defendants, and nothing in the record to indicate any collusion. Port Medical's only contention on this point is: "But that conclusion [that there is no evidence defendants intended to deny valid claims] is belied by the fact: (1) The treatment was covered; (2) [Connecticut General] admitted it has never been able to find evidence of provider fraud; and (3) The claims were still never paid. A jury could properly infer from that evidence that neither [Connecticut General] or [*sic*] the Plan intended that payment would be made." This bare argument, notably unsupported by any evidence that the claims at issue were covered under the Plan, fails to create a dispute of material fact sufficient to survive summary judgment.

**DISPOSITION**

The judgment is affirmed. Respondents to recover their costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, Acting P. J.

WE CONCUR:


EGERTON, J.


DHANIDINA, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/1/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PORT MEDICAL WELLNESS, INC., | B275874 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC497312 |
| v. | |
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY, et al., | |
| Defendants and Respondents. | |

BY THE COURT:*

The ILWU-PMA Welfare Plan and ILWU-PMA Welfare Plan Board of Trustees have requested that our opinion in the above-entitled matter, filed May 10, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The opinion is ordered published in the Official Reports.

44

*LAVIN, Acting P.J.  EGERTON, J.  DHANIDINA, J.*6

---

*6  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.